# ATTACHMENT A:
## AFFIDAVIT OF IN SUPPORT SEARCH WARRANT FOR THE BUSINESS PROPERTY OF RESTORATION CONTRACTORS OF AMERICA AND UNITED ATLANTIC PUBLIC ADJUSTORS, 6441 HENDRY ROAD, SUITE B, CHARLOTTE, NORTH CAROLINA, 28269

I, William Oros, Special Agent with the Charlotte Resident Office of the United States Environmental Protection Agency, Criminal Investigation Division, being duly sworn and deposed, state as follows:

## BACKGROUND/INTRODUCTION

1. I am a Special Agent with the United States Environmental Protection Agency (EPA), Criminal Investigation Division (EPA-CID). I have been so employed since approximately August 2008. As part of my EPA-CID training, I attended the Federal Law Enforcement Training Center in Glynco, Georgia and completed the twelve-week Basic Criminal Investigator Training Program. I have also completed the nine-week EPA-CID Environmental Investigator Basic Training Program. I have received training in investigating violations of the federal environmental and Title 18 laws and have investigated numerous pollution-related offenses and permit violations. I have a Bachelor of Science degree with a concentration in biology and a minor in chemistry. From February 1998 until August 2008, I was employed as an Environmental Analyst by the State of Connecticut Department of Environmental Protection. As an Environmental Analyst, I received training with respect to, and participated in, the investigation of violations of environmental laws and regulations. I have attended numerous training courses on techniques for investigating environmental crimes and participated in the execution of multiple federal search warrants.

2. As part of my duties as an EPA-CID Special Agent, I investigate criminal violations of environmental laws, including the Toxic Substances Control Act (TSCA) at 15 U.S.C. § 2615(b), as well as violations of Title 18 of the United States Code. I am duly authorized by Title 18, United States Code, Section 3063, to carry firearms, to execute and serve any warrant or other process issued under the authority of the United States, and to make arrests without warrants for any offense committed in my presence or for any felony offense that I have probable cause to believe the person to be arrested has committed or is committing.

3. The statements made in this Affidavit are based on my personal knowledge; my training, education, and experience; information that I have received from regulatory personnel; and information contained in records that are maintained by offices and employees of the government of the State of North Carolina as well as information provided by individuals with knowledge of relevant facts. Because this Affidavit is being submitted for the limited purpose of securing a search warrants for the "Place to be Searched" described herein and in Attachment B hereto, I have not included each and every fact known to me concerning this investigation.

## STATUTORY AND REGULATORY BACKGROUND

**Toxic Substances Control Act – 15 U.S.C. § 2615(b)**

4. TSCA provides that "Any person who knowingly or willfully violates any provision of section 2614 or 2689 of this title, shall . . . be subject, upon conviction, to a fine of not more than $50,000 for each day of violation, or to imprisonment for not more than one year, or both."

5. In 1992, Congress amended TSCA, adding 15 U.S.C. §§ 2681 through 2692, to address lead paint activities such as lead-paint inspections of buildings, risk assessments of lead paint hazards and lead abatement work. Lead paint had been commonly used indoors until health

research showed a link to childrens health. By 1992, an estimated 3,800,000 American homes contained chipping or peeling lead paint, or excessive amounts of lead-contaminated dust. Medical research indicated that, at low levels, lead poisoning in children caused intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems.

6. Under the authority of the TSCA amendments, EPA promulgated regulations governing lead-based paint activities. These regulations ensured that individuals engaged in such activities are properly trained, that such training programs are accredited, and that contractors engaged in such activities are certified; furthermore, the regulations provide extensive requirements and standards for performing lead based paint activities. 15 U.S.C. § 2682.

7. The Lead Based Paint Activities regulations apply to target housing, which is defined generally as housing constructed prior to 1978, with the exception of housing for the elderly or persons with disabilities (unless a child less than six years of age resides there), or zero-bedroom dwellings. 15 U.S.C. § 2681(17); 40 C.F.R. § 745.223. The types of activities that would be subject to these regulations include inspections for the presence of lead-based paint, risk assessments for lead based paint hazards, and the abatement or removal of lead-based paint hazards. 15 U.S.C. §§ 2681 and 2682. The EPA regulations require that personnel involved in lead paint work be trained and certified. 40 C.F.R. § 745.226. Abatement work, if performed, must follow the work practice standards set forth at 40 C.F.R. § 745.227. Inspections for the presence of lead-based paint must be conducted by certified personnel (40 C.F.R. § 745.227(b)), must include sampling of specified areas (40 C.F.R. § 745.227(b)(2)), and must use documented methodologies (such as an x-ray fluorescence (XRF) device) or analysis of samples by an EPA-approved lab (40 C.F.R. § 745.227(b)(3)). The inspection report must include the testing method

used and must include the serial number of any XRF device employed. 40 C.F.R. § 745.227(b)(4)(viii). More extensive requirements apply if, instead of an inspection, the purpose of the visit is to perform a lead hazard screen (40 C.F.R. § 745.227(c)), or a risk assessment (40 C.F.R. § 745.227(d)).

8. States may seek authorization from the EPA to administer and enforce their own lead-based paint activities programs. 15 U.S.C. § 2684; 40 C.F.R. part 745, subpart Q. To receive such authorization, a State must demonstrate that its program is at least as protective of human health and the environment as the federal program, and that it provides adequate enforcement mechanisms. 15 U.S.C. § 2684(b); 40 C.F.R. §§ 745.325, 745.326, and 745.327. Under TSCA, the authorized State regulations apply in lieu of the federal regulations. 15 U.S.C. § 2684(a). As a result, federal enforcement of the lead training or inspection rules would cite the state counterpart rules, rather than the federal rules.

9. The State of North Carolina has a lead certification and accreditation program administered by the North Carolina Department of Health and Human Services (NCDHHS) that, among other things, administers the certification and accreditation of persons and firms conducting lead-based paint management activities (abatement, inspection, risk assessment, project design, and clearance testing) in the State of North Carolina under North Carolina General Statute, Chapter 130A, Public Health, Article 19B.

**Mail Fraud - 18 U.S.C. § 1341**

10. 18 U.S.C. § 1341 provides, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin,

4

obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

**Wire Fraud - 18 U.S.C. § 1343**

12. 18 U.S.C. § 1343 provides that "whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

5

# ELECTRONIC DEVICES

13. Based on my training and experience, participation in environmental crimes investigations and financial investigations, which result from violations of environmental protection laws, I know:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Subjects commonly use cellular telephones to communicate with other members of their organization, and with customers. Cellular telephones have the capability of storing numerous telephone numbers of other individuals. Cellular telephones also can have "Caller ID" and "Text Messaging" features on the telephones. "Caller ID" identifies the telephone numbers of the incoming calls. Text messages can be stored on the cellular telephone and also identifies whom the message was sent to or whom it came from. In addition, cellular telephones have the capability of recalling past telephones numbers dialed.

   c. The data stored on cellular telephones is generally easy to delete. In fact, many phones have the ability to have their memory completely deleted remotely, such as via the Internet.

   d. Electronic devices, including some cell phones, are devices capable of storing various types of data, including downloaded music, video, voice memos, photographs, and emails from computer or Wi-Fi connection. The fact that certain electronic devices can hold or contain email, text, or other similar data content is significant due to the fact that such devices can store text data that includes, but is not limited to, records of transactions and contact information for co-conspirators.

   e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs

6

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Tablet and Laptop: A tablet and laptop is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

  g. Desktop or other traditional computers: Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

  11. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not

7

limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

11. In October 2019, I was assigned to a criminal investigation of the alleged fraudulent lead and asbestos inspections and sample collection in residential homes being conducted by Restoration Contractors of America (RCA) 6441 Hendry Road, Suite B, Charlotte, North Carolina 28269, under the fictitious business name Environment Abatement Testing (EAP). Additionally, United Atlantic Public Adjusters (UAPA), also located at 6441 Hendry Road, Suite B, Charlotte, North Carolina 28269, is allegedly conspiring with RCA to bill insurance companies for the fraudulent lead and asbestos work. I have reviewed information the EPA-CID received from the NCDHHS, the North Carolina Department of Insurance, and various insurance companies, and conducted interviews regarding the alleged fraudulent lead and asbestos inspections and insurance billing.

12. Former RCA "Employee A" notified me that:

   a. They worked for RCA from October 2016 until April 4, 2019. They identified Brent EMERSON (EMERSON) as the owner of RCA and Jill GODEN (GODEN) as the owner of UAPA.

   b. EMERSON spoke to Employee A and former RCA "Employee B" in November 2018, notifying them that RCA was in financial trouble. EMERSON laid out a plan to generate money for RCA by performing asbestos and lead testing. According to EMERSON, GODEN had told EMERSON that if EMERSON got into the asbestos business, he could make big money on the asbestos testing alone. EMERSON sent Employee B to an asbestos inspection class.

8

c. EMERSON and Employee B both went to the asbestos inspection class and, after Employee B left RCA, EMERSON and RCA continued to use Employee B's name on sampling documentation.

d. Employee A reviewed an RCA customer's lead and asbestos testing invoices. Employee A said the testing cost approximately RCA $20 but RCA, using the fictious company Environment Abatement Protection (EAP), charges thousands of dollars more. Employee A pointed out that, as an example, the customer was charged for lead testing that wasn't done. However, the customer was billed $5,572.71 for the testing of three asbestos samples and one lead sample.

e. The EAP office in Raleigh was a fictitious business and office. The office space was previously used by RCA but was closed. EMERSON wanted to keep EAP and RCA separate so he decided to use the Raleigh address. GODEN helped EMERSON set up EAP as a business.

f. Many of the files maintained by RCA and UAPA are electronic computer files, emails are shared between the two businesses, and QuickBooks is used for financial matters. All RCA and UAPA office employees have computers.

g. RCA and UAPA moved offices form 10130 Perimeter Parkway Road, Charlotte, North Carolina, to 6441 Hendry Road, Suite B, Charlotte, North Carolina 28269, in 2018. RCA and UAPA occupy the same space within the suite. RCA and UAPA still receive mail at the Perimeter Parkway location.

13. Former RCA Employee B notified me that:

a. Employee B worked for RCA for approximately 2 years, he resigned in April 2019. He identified EMERSON as the owner of RCA and Greg MURDIE

9

(MURDIE) as a manager. He identified Jill GODEN and Eric Goden as owners of UAPA.

b. RCA was going broke doing roofing jobs. EMERSON came up with the business EAP to get the money associated with the testing of asbestos and lead. He said EMERSON intended to funnel the money from the testing back to RCA's roofing division.

c. EMERSON came up with the idea of conducting the environmental testing. EMERSON enlisted Employee B to go to lead and asbestos inspection certification classes. EMERSON claimed he obtained his lead inspection license from the State of North Carolina but never obtained the asbestos license. EMERSON told him it was still fine to collect the asbestos samples without the license, so Employee B started collecting samples for asbestos in February or March of 2019 for RCA. They said EMERSON also took the asbestos inspection class. Employee B estimated they had sampled approximately 30 residential properties between February and April 2019.

d. Employee A prepared the invoice form templet for EAP. EMERSON filled out the invoices to include the charges billed to the customer and their insurance providers. He said there is a folder containing the invoices at RCA's office in Charlotte North Carolina. He said he nor Employee A ever worked at the EAP office in Raleigh North Carolina, and that the EAP office in Raleigh was a fictitious business location.

e. GODEN worked with EMERSON billing insurance companies for the lead and asbestos testing. There are letters from GODEN in RCA's office. RCA and

UAPA share office space in Charlotte, North Carolina. Because RCA and UAPA share the same business space Employee B has heard GODEN on the telephone with insurance companies representing customers and RCA.

14. GODEN, sent the following email to Erie Insurance along with an invoice for lead and asbestos testing. The lead and asbestos testing invoice attached to the email is on EAP letterhead with an invoice total of $5,461.86.

> "I represent the client, Perry McCorkle and Restoration Contractors of America. RCA is about to perform work on this house in coming weeks and upon auditing realized the house was built in 1945. RCA is a certified asbestos restoration company. As you are aware and have noted in your estimate there was interior damage where the insulation had gotten wet and thus disturbed. The year this house was built is prime for possible asbestos and lead, and this house must be tested, Environmental Abatement Protection Company did just that. This as you know is not a line item in estimate, it is under the hazard supplement section. Specialists in all phases of testing must conduct these tests to be done correctly under Osha and the EPA guidelines. The testing was done according to law so as not to release any possible fibers, prior to any work being done on this house. Environmental Abatement and Restoration Contractors of America must protect the homeowner, so several tests have been conducted before anything was disturbed. I am attaching both the invoices for the testing as well the documentation substantiating the tests. When the result come back I will submit them to you. Please reimburse me as soon as possible so that I can pay for any additional tests if warranted.
>
> Thank you,
> Jill Goden, Licensed PA"

15. An EAP testing reported for samples lead and asbestos samples collected on May 28, 2019 states the following:

   a. ABOUT US

   Thank you for hiring the services of our company. Environmental safety and health is literally a life changing practice and result. Environmental Abatement Protections is more than a niche company. Inspecting and diagnosing the best place to test is more than half of the battle. We are specialists in an already specialized industry that has the experience to handle hundreds of clients each month with the accuracy second to none.

11

We are biologists, inspectors, builders, and in the end, all scientists. It takes a team to build and operate a cohesive unit that can accurately inspect and produce the samples and results that today's regulations demand. The staff shares years of experience and advocates the safety of workers, property owners and the regulations that govern the hazard industry. Our mission is simple: Be professional, accurate, kind, reliable and to work to perform our services with integrity 100% of the time.

BRENT EMERSON

CEO

    b. TECHNICIANS

Our inspectors are certified in lead and asbestos and have been trained both in OSHA safety for sampling as well as inspecting. Our specialty is residential homes and therefore, not only do our inspectors take core samples but are also trained to seal and label the test zones.

    c. QUALIFICATIONS AND CREDENTIALS

Specializing in residential sampling, our technicians carry certifications in ASHERA Asbestos Courses, Supervisor and Inspection Courses, Lead Inspector and Renovator Certificates, as well as OSHA certified and NIOSH certification.

16. NCDHHS personnel have notified me that:

    a. Persons wanting to be and asbestos or lead inspector must attend an initial, multi-day, asbestos or lead inspectors' course. Once issued, an initial course passing certificate the State of North Carolina will review and issue an asbestos inspectors accreditation or a lead inspector's certification. Asbestos refresher courses are required every year, and lead refreshers are required every two years to maintain the accreditation or certification.

    b. EMERSON, Michael Pecora, Gary MURDIE, and Employee B, who are current and former management or employees of RCA, do not have accreditations for asbestos inspections nor are they certified in lead inspection with NCDHHS.

12

Case 3:20-mj-00018-DCK   Document 1-2   Filed 01/22/20   Page 12 of 19

c. In accordance with NCDHHS rules, a certified Renovation, Repair, and Painting (RRP) business can take lead wipe and paint chip samples as long as they have an employee with a renovator initial training certificate. The NCDHHS database shows the RCA became certified as an RRP on March 21, 2019. Employee B holds a renovator initial training certificate and was an RCA certified renovator. However, Employee B is not a certified lead inspector. Additionally, Employee B resigned in April 2019, and if an RRP does not have a certified renovator on staff, they cannot perform lead wipe or paint chip sampling. The NCDDHHS database was reviewed and confirmed that there are no other certified renovators working for RCA.

d. NCDHHS staff reviewed an Environmental Abatement Protection (EAP) report for samples collected at the property of Jeffrey Norville on May 28, 2019, referenced above. According to NCDHHS staff, the report appears to be a full consulting report, to include asbestos and lead inspection and abatement services. They said they did not understand why PCB and silica sampling was being performed by EAP in a residential home, because they are not chemical or compounds found in residential properties or regulated as such. They noted incorrect test methods were being used for the analysis of lead and that, although the documents suggest vermiculite was sampled, they did not believe vermiculite was present in photographs, included in the report, in areas sampled. They said the report and sampling go well beyond the scope of an RRP certification and that lead and asbestos abatement, inspection, risk assessment, project design, and

clearance testing certifications and accreditations would be required to perform the work and sampling documented in the Norville report.

17. Travelers Insurance Investigator, Mark Meagher (Meagher), has notified me that:

   a. Meagher investigated a claim for a property owner, Sharon Ballard (Ballard), where RCA collected asbestos and lead samples and UAPA submitted the bill for those sample to Travelers Insurance for reimbursement. Samples collected were associated with storm damage to a roof that caused water damage on the interior of the home.

   b. Meagher said Travelers refused to pay the sampling claim because the chain of custody for samples collected on May 31, 2019, showed EMERSON, Owner of RCA, collected the samples. Through further investigation, and the interview of Ballard, it was determined that Eric Maglero (Maglero), an RCA employee, took the samples on April 11, 2019, and appears to have filled out the chain of custody with EMERSON's initials as the sampler. Based on a review of the NCDHHS database, and after consulting with NCDHHS, Maglero determined that neither EMERSON nor Maglero are certified or accredited to inspect or collect samples for asbestos and lead.

   c. Meagher said that, after repeated attempts by GODEN, Owner of UAPA, to obtain the reimbursement from Travelers Insurance, and Travelers confronter her regarding Emerson's and Maglero's lack of certifications and accreditations, GODEN hired Ward Smith (Smith) in or about October 2019 to collect lead and asbestos samples. Meagher verified Smith is certified and accredited to collect asbestos and lead and perform inspections. Travelers Insurance investigator Tina

14

Kennedy-Sightler (Kennedy-Sightler) interviewed Smith on November 8, 2019. Smith said he had only been working for RCA for 3 to 4 months and has only performed approximately 6 samplings and inspections for RCA.

d. Meagher said that, based on sampling information submitted to Travelers by UAPA on behalf of RCA and Ballard including sample results and chain of custody, he found several irregularities. Meagher said Smith did not complete of the sampling paperwork; Maglero did. Smith never signed the samples over to Maglero, and Maglero took the samples to the laboratory. Meagher also said that samples were taken from all over the residence well beyond the affected water damaged area. Investigator Kennedy-Sightler interview of Smith state the following in part:

"Mr. Smith was questioned about whether he'd filled out the Chain of Custody forms; two for asbestos testing, one for lead, and one for silica. He stated Eric completed all the forms then Mr. Smith he stated that Eric would ask him to print his name and sign the Chain of Custody forms as the Sampler. When asked why the Chain of Custody forms showed no record of him relinquishing any samples into Eric's custody, he was unable to provide an explanation but acknowledged doing do."

"Mr. Smith was asked if it was typical for him not to complete the Chain of Custody forms himself and if the process he described involving collecting samples and relinquishing the samples to Eric with no record on the Chain of Custody forms was typical. He stated he has had his business for approximately 16 years and, typically, he filled out the Chain of Custody forms himself and delivered the samples to the lab. He further stated Eric told him would take care of it for him."

e. Meagher said the Ballard claim investigation was reopened when GODEN submitted a new claim on November 11, 2019. GODEN claimed the entire home needed abatement for asbestos and lead and submitted an estimate in the amount of $44,518.04 which includes $7,841.62 for testing fees.

15

18. EAP was registered as an LLC in Maryland, February 12, 2019, with GODEN as the registered agent as an inspection company for lead, mold, and asbestos. The previously mentioned EAP testing report identifies the EAP business address as 8601 Six Forks, Raleigh, North Carolina, 27515. On November 5, 2019, I verified EAP nor RCA have offices at the 8601 Six Forks address.

19. I submit that a search, forensic analysis, and seizure of electronic data from the phones and electronic devices seized in this case is likely to provide incriminating evidence against EMERSON, GODEN, and other targets of the investigation.

## CONCLUSION

Based upon training, experience, and the facts of this investigation, I submit that there is probable cause to believe that Items to be Seized, listed in Attachment C, will be found inside of the "Place to be Searched," described in Attachment B (including the land, building, and any outbuildings or vehicles), and that it will yield evidence relevant to the alleged violations of the Toxic Substances Control Act, 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud); therefore, I request that the Court issue warrants to search them.

_____
AFFIANT, SPECIAL AGENT, WILLIAM OROS
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
CRIMINAL INVESTIGATION DIVISION

*AUSA Steven R. Kaufman reviewed this Affidavit.*

Subscribed and sworn to by me this 22nd day of January 2020.

_____
THE HONORABLE DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE

17

# ATTACHMENT B
## Location to be searched

The following is an image of 6441 Hendry Road, Suite B, Charlotte, North Carolina 28269:

Restoration Contractors of America (RCA) and United Atlantic Public Adjusters (UAPA) are located in the Berkshire Business Center. The building is a red brick structure with glass doors. Each suite has a letter and sign over the door identifying the suite letter and business. Suite B has an RCA sign above it.




# ATTACHMENT C
## Items to be Seized

This Affidavit is made in support of this Application to seize the following items:

1. Documents related to Restoration Contractors of America (RCA), Environment Abatement Testing (EAP), and United Atlantic Public Adjusters (UAPA) business (including but not limited to books, records, papers, notes, licenses, certificates, calendars, correspondence, ledgers, receipts, billing records, invoices, work orders, insurance claims, inspection and test records, regulatory records, directories, corporate structure records, corporate asset records, identification cards, schedules, addresses, telephone records, payroll records, time cards, tax records, employee files, applications, contracts, training records, instructor files, customer files, policy and title documents).

2. Media that can contain documents or recordings related to RCA, EAP, and UAPA business (including but not limited to cameras, tablets, phones, computers, external storage devices, or other electronic devices).

3. Electronically stored data, to include all records on the cameras, tablets, phones, computers, external storage devices and other electronic devices seized, that relate to violations of the Toxic Substances Control Act 15 U.S.C. § 2615(b); the prohibition on Mail Fraud under 18 U.S.C. § 1341 and Wire Fraud under U.S.C. § 1343. As used above, the term "records" includes all evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.